# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| MICHELLE C. ZEITER, individually and as Special Administrator for the Estate of Michael Buchna, and JENNIFER C. BEAM, individually and as Special Administrator for the Estate of Michael Buchna,<br><br>     Plaintiffs<br><br>v.<br><br>WALMART INC. and WALMART STORES, INC.,<br><br>     Defendants | Case No.: 2:21-cv-00061-APG-DJA<br><br>**Order Granting in Part Plaintiffs' Motion to Strike Walmart's Answer**<br><br>[ECF No. 118] |

In February 2019, Michael Buchna fell outside the front entrance of a Walmart store in Las Vegas. Buchna sued defendants Walmart Inc. and Walmart Stores, Inc. in January 2021 for negligence and negligent hiring, training, supervision, and retention. ECF No. 1. Buchna died in August 2021, so his daughters and administrators of his estate, Michelle Zeiter and Jennifer Beam, substituted as plaintiffs. ECF Nos. 15; 27 at 2, 8. They filed an amended complaint that added a claim for wrongful death. ECF No. 27.

Walmart denied having notice of the event and denied having any documentation, surveillance video, or witnesses who knew about the incident. Even after discovery, which was contentious, no video or witness is available to explain how or why Buchna fell. This includes Buchna himself, who hit his head when he fell and did not recall what happened. The plaintiffs contend that Buchna fell due to a hazardous condition on Walmart's property, either cracks and divots in the sidewalk or a slippery substance. The defendants contend that Buchna fell because he had a seizure.

The plaintiffs move to strike Walmart's answer for spoliation and discovery misconduct under the court's inherent power and Federal Rule of Civil Procedure 37.  They argue that Walmart intentionally failed to preserve the store's surveillance video and produced no incident report, took no photos, and obtained no witness statements in order to deprive the plaintiffs of evidence to support their claims.  They also contend that after they filed suit, Walmart engaged in discovery misconduct and disobeyed court orders by refusing to disclose evidence, such as contact information for Walmart employees working at the time of the incident, Buchna's receipt, and repair reports for the area where he fell.  The plaintiffs assert that within days of Walmart finally producing employee contact information, they were able to locate multiple witnesses who recalled hearing about the incident despite Walmart's denial that any employee knew anything about it.

Walmart responds that I can sanction it based on the failure to preserve the video only under Rule 37(e) because it is electronically stored information (ESI).  Walmart asserts there is no basis to conclude that the video would have captured the fall or that Walmart purposefully failed to preserve the video in anticipation of litigation, so no sanction is warranted on that basis. With respect to employee witnesses, Walmart contends that it mistakenly responded in discovery that no Walmart employee knew of the incident when it should have said that no current employee who was on the clock on the day of the incident remembered it.  Although it acknowledges this error, it argues the error does not support striking its answer.  Walmart asserts that the plaintiffs are not prejudiced because it has now produced all requested evidence (to the extent it exists).  And it asserts that it has defenses on the merits and lesser sanctions are available, so I should not strike the answer.

I held a two-day evidentiary hearing on May 21 and 22, 2024. ECF Nos. 153; 155. Considering all the evidence presented in the briefing, at the hearing, and on the court's docket in this case, I grant in part the plaintiffs' motion.  I find that Walmart intentionally failed to preserve the video in anticipation of litigation to prevent the plaintiffs from obtaining that evidence.  I also find that Walmart engaged in an intentional course of discovery misconduct aimed at obstructing the plaintiffs from identifying witnesses and obtaining documentary evidence to support their claims, even defying multiple court orders to turn over information that Walmart's own witnesses testified was easily obtainable.  Given Walmart's efforts to stymie the plaintiffs' case, I impose a sanction precluding Walmart from disputing that a hazardous condition on its property caused Buchna to fall and injure himself, that Walmart had notice of the hazard and failed to remedy it, and that Buchna was not comparatively negligent.  No lesser sanction is available to address the prejudice.

However, I do not strike Walmart's answer entirely because striking all defenses, including those unrelated to Walmart's misconduct, is too severe in this case.  The sanction I am imposing is a lesser sanction that cures the prejudice.  Thus, to the extent Walmart has defenses that are unrelated to its misconduct, such as the reasonableness of Buchna's medical expenses, whether specific medical expenses were causally connected to the fall, whether Buchna's expected lifespan was shortened through pre-existing medical conditions, or failure to mitigate, those defenses are not stricken.

# I. BACKGROUND

## A.  The Incident

On February 28, 2019, Buchna fell outside a Walmart store. ECF No. 118-2 at 34, 109. A private security contractor working at Walmart, Sangria Vann, did not see Buchna fall but saw

him on the ground afterwards. *Id.* at 34, 38; Evid. Hrg. Day 2.  According to Vann, Buchna fell "just outside the automatic sliding doors under the covered area where the carts are kept." ECF No. 118-2 at 34, 43-44.  Vann called over the radio to inform Walmart staff that a customer had fallen. *Id.* at 35; Evid. Hrg. Day 2.  According to Vann, Ricardo Devis (a loss prevention officer) and Tammy Roberts (an assistant store manager) came to the scene.[1] ECF No. 118-2 at 35, 44; Evid. Hrg. Day 2.  Vann testified that Devis told her to call 911, which she did using her cell phone. ECF No. 118-2 at 35, 44, 60, 109; Evid. Hrg. Day 2.  Vann asked for towels because Buchna was bleeding from his head and, according to Vann, Roberts instructed another employee to bring towels. ECF No. 118-2 at 35, 63; Evid. Hrg. Day 2.  In Vann's declaration, she stated that she used at least three towels to soak up the blood. ECF No. 118-2 at 35.  But at the evidentiary hearing, Vann stated that she did not know what was done with the towels and that by the time the towels were brought out, the ambulance had arrived. Evid. Hrg. Day 2.  After the ambulance arrived, Vann or someone else took Buchna's shopping cart to the guest services counter.[2] *Id.*; ECF No. 118-2 at 35.

The ambulance arrived at "the front entrance of Walmart" to attend to a man who had a bleeding head injury. ECF No. 118-2 at 109.  The ambulance records state that Buchna "was reported by bystanders to be found on the floor seizing and bleeding from his head however no one was able to state [whether] he had fallen before having a seizure or not." *Id.*  The paramedics

---

[1] Susan Manterola was the store manager, but she was not present at the store that day. Evid. Hrg. Day 1.  When the store manager is not present, then assistant managers would perform her duties. *Id.*

[2] In her declaration, Vann stated that she took the cart to customer service. ECF No. 118-2 at 35.  At the evidentiary hearing, Vann did not mention that she returned the cart to customer service and instead testified that she went back to her post. Evid. Hrg. Day 2.  Beam testified that when she and Zeiter visited the store that night, the customer service representative had the cart of groceries and asked the daughters what they wanted to do with it. Evid. Hrg. Day 2.  Thus, someone returned the cart of groceries to customer service.

gave Buchna Versed and oxygen, but Buchna "was still delusional and unable to follow commands" and his "head injury was still bleeding." *Id.* at 109-10.  The paramedics gave Buchna another dose of Versed, which sedated him. *Id.* at 110.  The ambulance transported him to the hospital after being in front of the store for approximately 17 minutes. *Id.* at 109-10.

According to Vann, the sidewalk area where Buchna fell was pocked with cracks and holes consistent with photographs of the area that were taken years later. *Id.* at 34; Evid. Hrg. Day 2.  Vann testified that those holes and cracks were not filled during the time she worked there. Evid. Hrg. Day 2.  Vann also testified that there would be spills in the area around the nearby vending machines. *Id.*

Devis and Roberts do not deny that they were at the scene. Evid. Hrg. Day 1.  However, both testified they have no memory of this incident, even though neither one of them has seen particularly bloody incidents at the store. *Id.*  Roberts and Devis did not deny that cracks and holes in the sidewalk depicted in pictures taken at a later date may have existed when Buchna fell. *Id.*  Roberts also testified that she was aware that there can be spills around the vending machine area. *Id.*

**B.  The Daughters' Post-Incident Communications with Walmart**

At the hospital, Buchna told his daughters that he fell getting into his truck in the parking lot. ECF No. 118-2 at 76.  That night, Beam and Zeiter went to Walmart to pick up Buchna's truck and groceries and to locate his cell phone, but they could not find his cell phone in the truck and did not find any groceries there either. *Id.* at 76-77.[3]  They went to customer service to

---

[3] At the evidentiary hearing, Beam and Zeiter testified consistently with their deposition testimony about their interactions with Walmart personnel on the day of the fall and the two days afterwards. Evid. Hrg. Day 2.

ask if anyone had turned in his cell phone, but it was not turned in.[4] *Id.* at 76.  The customer service representative they spoke to was aware of the fall but could not provide information about it and asked what the daughters wanted done with Buchna's groceries. *Id.* at 77.  Zeiter told the employee to return the money to Buchna's card.[5] *Id.*  They asked if they could see the surveillance video, but the employee allegedly said they could not see it unless they filed a police report, so Zeiter and Beam left the store. *Id.* at 77-78.

The next day, Beam called the store. *Id.* at 96-97.  She did not recall who she spoke to, but the person told her that Buchna had not been mugged in the parking lot, rather he fell when exiting the store. *Id.*  Beam asked to see the videotape, but was told if she wanted to see it she would have to file a police report. *Id.* at 96.

The day after that, Beam called the store again and spoke to a woman named "Tammy." *Id.* at 73.  According to Beam, Tammy told her that her father fell near the front door and not in the parking lot. *Id.* at 73-74.  Beam also testified that Tammy said Buchna had a seizure, that Tammy held his hand until the ambulance came, and that Buchna never lost consciousness. *Id.* at 73.  According to Beam, Tammy told her that Tammy's own father had passed away about four months prior, a fact that Beam would not have known if she did not talk to Tammy that day. *Id.*  Beam characterized the conversation as an emotional one. *Id.*

Tammy Roberts does not deny this conversation took place but testified she does not remember it. Evid Hrg. Day 1.  Roberts stated that her father died in June 2018. *Id.*  Roberts

---

[4] Zeiter and Beam later found Buchna's cell phone in his house. ECF No. 118-2 at 78.

[5] It is unclear what happened to the refunded money.  Beam testified at her deposition that it did not appear as a refund on her father's card. ECF No. 118-2 at 78.  The receipt states that it was a cash refund on March 2, 2019, which is the day Beam spoke with Roberts by phone. *Id.* at 122; Evid. Hrg. Day 2.  There is no evidence Beam or Zeiter visited the store on March 2, 2019.

1 conceded that Beam would have no way of knowing that Roberts' father had passed away

2 months prior to this incident unless Roberts told her. *Id.*

3      **C. Walmart's Policies**

4         1.  Incident Report

5      Walmart's policies and procedures require that all incidents involving an injury must be

6 reported by management within 24 hours of becoming aware of it, regardless of how the injury

7 occurred or who was at fault. ECF No. 118-2 at 424; Evid. Hrg. Day 1.  The store manager

8 should investigate by interviewing individuals involved, obtaining witness statements, taking

9 photos, and securing video footage. ECF No. 118-2 at 424-34; Evid. Hrg. Day 1.  The manager

10 who responds to the scene of the incident prepares the report and requests video from the asset

11 protection department. Evid. Hrg. Day 1.  If video is requested, asset protection personnel copy

12 the video to a CD and give the CD to the manager who was in charge of the incident, who then

13 gives it to the personnel manager, who would send it to Walmart's home office in Arkansas or to

14 a third-party company called Sedgwick. *Id.*

15      Despite this policy, there is no dispute in this case that Walmart has not produced a video,

16 pictures, witness reports, an incident report, or any documentation whatsoever of Buchna's fall.

17 Multiple Walmart employees testified that it would be implausible that a customer could have

18 fallen outside the store entrance, bled on the ground, been attended to by an ambulance for over

19 15 minutes, and Walmart would not know about it. ECF Nos. 118-2 at 295-96, 410; Evid. Hrg.

20 Day 1.  Roberts and Devis both testified that if they had been present for the incident, they would

21 have preserved the video and prepared a report because it would have been their responsibility to

22 do so. Evid. Hrg. Day 1.  Roberts also stated in a prior declaration that if the incident was as

23 bloody as described, she would remember it. ECF No. 122-2 at 2.  But Roberts testified she does

not remember it, and Devis also testified he does not recall it. Evid. Hrg. Day 1.  Neither Roberts

nor Devis could offer an explanation as to why no video, report, pictures, or witness statements

are available in this case. *Id.*  However, both denied being asked not to preserve evidence and

denied being involved in concealing the incident. Evid. Hrg. Day 1.

### 2.  Repair Reports

It is Walmart's policy that employees inspect the premises for safety hazards, warn

customers of hazards (such as by placing safety cones over or near hazards), and repair hazards

as soon as possible. Evid. Hrg. Day 1.  Roberts testified that if a manager or other store employee

made a request to repair cracks in the sidewalk, there should be some record of it in the Fix It

app (other employees also referred to the repair request process as the "service channel," which

pre-dated Fix It). *Id.*; ECF No. 59-2 at 14.

### D.  Pre-Litigation Period

In the summer of 2020, Buchna and his daughters sought the assistance of counsel to

determine what happened to Buchna, as he could not recall what happened or how he fell. Evid.

Hrg. Day 1.  Throughout the fall of 2020, Buchna's counsel, Brock Ohlsen, contacted various

Walmart personnel, with no luck in securing video surveillance or other information about the

incident. *Id.*  After informal efforts failed, Ohlsen sent a letter to Walmart on November 3, 2020

asking for the store video. ECF No. 53-2 at 87; Evid. Hrg. Day 1, Ex. 15.  In this letter, Ohlsen

stated that Buchna's daughters had previously spoken to Walmart personnel to find out what

happened and were told they needed a police report to obtain the video. ECF No. 53-2 at 87;

Evid. Hrg. Day 1, Ex. 15.  Ohlsen's letter stated that "Sedgwick and the store's loss protection

department [have] been unable to locate" a Walmart incident report. ECF No. 53-2 at 83-84;

Evid. Hrg. Day 1, Ex. 15.  On November 10 and 18, 2020, Justin Mills from Walmart's claims

department responded that he could not locate any information regarding the incident. ECF No. 53-2 at 83-84; Evid. Hrg. Day 1, Ex. 15.

### E.  The Lawsuit and Discovery

On January 12, 2021, Buchna filed this lawsuit. ECF No. 1.  After Walmart was served, it filed its answer denying the plaintiffs' allegations because it had no documents, video, pictures, or witness statements in relation to this incident. Evid. Hrg. Day 2; ECF Nos. 9; 40-2 at 333.

Within a few months of Walmart filing its answer, its counsel at the time, Timothy Kuhls, went to the store to try to identify witnesses. Evid. Hrg. Day 2.  Kuhls testified that he met with the store's personnel manager and requested to speak to any employees who were still working at the store who were also working on the day of the incident. *Id.*  Kuhls relied on the personnel manager to identify those individuals. *Id.*  Kuhls recalled speaking to only two or three individuals, none of whom was a manager. *Id.*  He did not recall speaking with Roberts or Devis.[6] *Id.*  Kuhls looked through every incident report in the personnel manager's office to see if there was one that had been misfiled, but he did not locate one. *Id.*

According to Kuhls, after he later obtained the employees' clock in/clock out information, he would have gone back to the store a second time to try to meet with anyone who was still working there. *Id.*  It is unclear when this occurred.  During the approximately 11 months that Kuhls was Walmart's counsel, he did not attempt to contact employees who had been transferred to a different store or who were no longer employed by Walmart. *Id.*

---

[6] By this time, Roberts and Devis had each moved to another store (Roberts in May 2019, and Devis sometime "after Covid"). Evid. Hrg. Day 1.

On July 21, 2021, Walmart made its Rule 26 initial disclosures. ECF No. 118-2 at 126-31.  The only employee witness that Walmart identified was an unnamed "person most knowledgeable." *Id.* at 128.  Walmart did not identify any relevant records of its own. *Id.* at 129.

In November 2021, Walmart supplemented its disclosures, but did not add any Walmart witnesses or documents. *Id.* at 133-38.  The plaintiff's first set of interrogatories asked Walmart to name any witnesses that Walmart believed or understood to have witnessed the incident, or to have knowledge of events leading up to it, or the subsequent investigation, and those witnesses' contact information. *Id.* at 169.  Walmart identified only the paramedics. *Id.* at 169-70.  Walmart stated that it did not know about the incident, so it had no incident report, pictures, or video. *Id.* at 170-72.

In late 2021, the plaintiffs located Vann through obtaining the 911 call from the Las Vegas Metropolitan Police Department. Evid. Hrg. Day 1; ECF No. 118-2 at 36, 42.  Vann signed a declaration outlining the incident as described above and stated that as of December 8, 2021, no one from Walmart had ever contacted her. Evid. Hrg. Day 2; ECF No. 118-2 at 34-38.

In January 2022, Walmart provided its second supplemental disclosures. ECF No. 118-2 at 140-46.  For the first time Walmart identified by name an employee witness, Frisco Rivera, who was expected to testify that the plaintiffs did not report the incident and that Walmart was first notified of the event in January 2021 when the complaint was filed in this case. *Id.* at 143.  Walmart also disclosed its policies and procedures, job descriptions, insurance, and floor plan. *Id.* at 143-44.  A few days later, the plaintiffs produced Vann's declaration to Walmart. ECF No. 40-2 at 11, 13, 188.

In March 2022, Walmart responded to interrogatories by stating that it had no knowledge of the incident because the incident was not reported to it until two years later. ECF No. 118-2 at

154.  Walmart stated that "the subject surveillance video would have likely captured the alleged

incident" but the "video is not available as Mr. Buchna, nor any member of his family, reported

the incident to Walmart staff within 30 days of it occurring." *Id.* at 158.  Walmart stated that if it

had known of the incident, it would have preserved the video. *Id.*  In interrogatory number 15,

Walmart was asked to provide "a complete list of employees working for [Walmart] at the

subject premises" on the date of the incident, whether working that day or not. *Id.* at 160.  In

response, Walmart stated that "none of the Associates 'on the clock' on the morning of February

28, 2019 at Store 3351 have any knowledge of, let alone personal firsthand knowledge of,

Plaintiff's alleged incident." *Id.*  Walmart asserted that it would therefore be disproportionate to

the needs of the case to identify all employees, and it refused to do so "absent a good faith meet

and confer with Plaintiff's counsel or should the Court order the same." *Id.* at 160-61.

   In response to the plaintiffs' second set of requests for production that requested all

documents related to the maintenance, inspection, and upkeep of the front area of the store where

Buchna fell, Walmart produced its policies and procedures, but it did not identify any repair

records. *Id.* at 195, 200-01.  Walmart refused to produce personnel files for employees

supervising or performing inspection or maintenance of the premises or working in the asset

protection department because none of these employees was disciplined as a result of the

incident. *Id.* at 203-04.  When asked to provide a copy of employees' timecards for the month of

February 2019, Walmart asserted that it "does not keep physical 'time cards' for each Walmart

employee," so it had no documents to produce. *Id.* at 213-214.  When asked for Buchna's

receipt, Walmart asserted it was not in possession of the receipt and that it was "not in possession

of any evidence Buchna ever entered the Store on the date identified, let alone that he purchased

goods at the Store." *Id.* at 217-18.  About two weeks after these discovery responses, Kuhls

1   withdrew as Walmart's attorney. ECF No. 30.  Walmart was represented primarily by attorney

2   Matthew Beckstead of the firm Resnick & Louis, P.C. throughout the remainder of discovery.

3        On April 7, 2022, the plaintiffs moved to strike Walmart's answer based on Walmart

4   failing to preserve the video and hiding witnesses because Walmart would not identify any of its

5   employees. ECF No. 40.  A few weeks later, Walmart produced its third supplemental

6   disclosures in which it identified for the first time store managers Jennifer Hook and Tammy

7   Roberts as witnesses. ECF No. 118-2 at 442-43.  Walmart's fourth supplemental disclosures

8   identified Walmart employees Raudel Torres-Pineda (who was a manager at the store) and Justin

9   Mills (the counsel with whom Ohlsen communicated in November 2021). *Id.* at 454.

10       Shortly after these disclosures, the plaintiffs deposed Torres-Pineda and Frisco Rivera.

11  Torres-Pineda was an assistant manager who was working the day of the incident. *Id.* at 338.

12  According to Torres-Pineda, Walmart could look up Buchna's receipt, which Walmart had not

13  yet produced in discovery. *Id.* at 349; Evid. Hrg. Day 1 (Roberts and Devis testifying it would be

14  easy to look up a customer's receipt); ECF No. 88 at 114 (Magistrate Judge Albregts later

15  ordering Walmart to produce the receipt).  Torres-Pineda testified that it is implausible that

16  Walmart would not have known about a customer laying bleeding in front of the store with an

17  ambulance there for 15 minutes. ECF No. 118-2 at 353.  Torres-Pineda stated that the first time

18  he learned about the incident was a "few weeks" before his April 2022 deposition. *Id.* at 337.

19       Rivera was the store's asset protection manager, but he had not yet started working at the

20  store at the time of the incident. *Id.* at 280-81.  During his deposition as Walmart's Rule 30(b)(6)

21  witness, Rivera revealed for the first time that the asset protection employee on duty that day

22  would have been Devis, whom Rivera had not yet spoken to about the incident. *Id.* at 286-87.

23  Rivera also identified for the first time another employee who was working on that date, Chris

Guerin, as being a host who checked receipts. *Id.* at 282.  Rivera stated that he had looked at a list of Walmart employees that were at the store on the date of the incident, including the employees' punch-in/punch-out times, but Walmart's counsel would not turn the list over to the plaintiffs' counsel, claiming it was attorney work product. *Id.* at 285.  Rivera testified that Walmart should easily be able to compile the employee information. *Id.*; *see also* Evid. Hrg. Day 1 (Roberts agreeing that it would be easy for Walmart to determine who was clocked in on the date in question).

Rivera stated that when he investigated the incident in relation to this litigation, he contacted only the salaried employees and did not try to determine who brought the towels to the scene because it "could have been anybody." ECF No. 118-2 at 285.  Testifying as Walmart's Rule 30(b)(6) witness, Rivera agreed that if a Walmart manager, asset protection specialist, customer service representative, or other employee (such as the one who brought towels to the scene) knew of the incident, then Walmart had notice of it. *Id.* at 286, 295-96, 299.  Like Torres-Pineda, Rivera agreed that it does not make sense that this incident could have happened without the asset protection department knowing about it. *Id.* at 306.  Rivera also testified that the surveillance camera could have captured the fall, and that it was working that day. *Id.* at 295; *see also* ECF No. 123-2 at 158 (picture of camera outside Walmart entrance); Evid Hrg. Days 1 & 2 (Devis, Rivera, and Wood testifying that the camera would have captured the fall and to their knowledge it was working on the day of the incident).  According to Rivera, Walmart could look up Buchna's receipt and return, but he did not try to do so. ECF No. 118-2 at 308.  After these depositions, Walmart disclosed its fifth supplemental disclosures, but it did not name Devis or any other employees beyond those already identified. *Id.* at 465-66.

On May 17, 2022, the plaintiffs deposed Devis.  He denied any memory of the incident. *Id.* at 396.  He did not dispute that he could have gone to the scene, but he did not remember it. *Id.*  Like Torres-Pineda, he stated that he had no recollection of anyone from Walmart contacting him until a few weeks before his deposition.[7] *Id.* at 397.

A few days later, the plaintiffs deposed Roberts, who also denied recalling the incident but had no reason to dispute Vann's version of the events. *Id.* at 373-74.  Roberts testified she had no explanation for why there was no video, pictures, or witness statements. *Id.* at 379. According to Roberts, there were cracks in the cement outside the Walmart store in 2019 that needed repair. *Id.* at 375.  Roberts denied she participated in a coverup or destroyed evidence of the incident. *Id.* at 379.

In late May 2022, the plaintiffs noticed Kuhls' deposition, requesting that he bring any documents he had that contained "factual data about this case," including anyone he spoke to at Walmart. ECF No. 65-2.  The plaintiffs also moved to compel Walmart to produce (1) the employees' punch details and any other documents reflecting all employees working that day plus contact information for any employee no longer employed by Walmart, (2) repair records from February 28, 2017 to February 28, 2022, and (3) the receipt for Buchna's purchases. ECF No. 59.  Walmart sought a protective order to prohibit Kuhls' deposition. EFC No. 65.

On October 7, 2022, Magistrate Judge Albregts held a hearing on numerous discovery related motions. ECF No. 88.  At that hearing, he ordered Walmart to provide to the plaintiffs a

---

[7] Several other Walmart employees stated they had not been contacted until shortly before their depositions in April or May 2022. ECF No. 123-2 at 301 (Susan Manterola, store manager who was not present on the day of the incident, testifying she did not talk to any Walmart lawyer and did not recall speaking Walmart lawyer Kuhls); 61-15 at 11 (Roberts testifying the first time she learned of the incident was in April 2022); 123-2 at 265 (assistant store manager Jennifer Hook stating that the first time she learned of the incident was about a month before her May 2022 deposition).

list of employees working at the time of the incident, their punch in and out times, and contact information for any employee no longer working for Walmart. *Id.* at 96, 125-27.  He also ordered Walmart to produce Buchna's receipt. *Id.* at 114.  He ordered Walmart to produce these items within 30 days. *Id.* at 142.  Walmart did not comply. Evid. Hrg. Day 2.  The plaintiffs' counsel conferred with Walmart's attorney, Beckstead, multiple times in November 2022 regarding Walmart's failure to comply. Evid. Hrg. Day 2; ECF Nos. 93-3; 93-4; 93-5.

On November 30, 2022, Walmart identified 360 employee names without specifying their department or job title and provided no contact information. ECF No. 111-2 at 42-64; Evid. Hrg. Day 2.  The parties' lawyers conferred again in early December 2022, but Beckstead stated that the plaintiffs would have to file an order to show cause to get the employee contact information even though Judge Albregts had already ordered Walmart to provide that information. Evid. Hrg. Day 2.  On December 8, 2022, the plaintiffs filed a motion for an order to show cause why Walmart should not be held in contempt based on Walmart not complying with Judge Albregts' October 7 orders. ECF No. 93.

In December 2022, Walmart disclosed a list of repair orders, including a May 2, 2022 "Repair Order for Concrete Outside General Merchandise Entrance." ECF No. 111-2 at 201. The parties' lawyers thereafter exchanged emails about Walmart's production (or lack thereof). During these communications, the plaintiffs' counsel noted that Walmart had not produced actual incident or repair reports (as opposed to merely a list of repair orders). *Id.* at 243. Beckstead responded that Judge Albregts' October 7 rulings went beyond what the plaintiffs had requested in discovery, and he claimed that Judge Albregts' orders "were an abuse of discretion," even though Walmart never objected to those orders. *Id.* at 242.  Beckstead stated that what the plaintiffs sought was beyond the scope of Rule 26(b)(1) and he stood by Walmart's prior

objections, although he offered to meet and confer. *Id.*  Walmart thereafter provided Buchna's receipt, the employees' punch details but without specifying each employee's department or job title and providing no contact information, and a list of repair orders but only two repair reports. ECF Nos. 97; 97-4; Evid. Hrg. Day 2.

On February 7, 2023, Judge Boulware, who was previously assigned to this case, held a hearing on the plaintiffs' motion to strike Walmart's answer, among other things. ECF No. 101; Hrg. On Mot. To Strike (Feb. 7, 2023); Evid. Hrg. Day 2.  At that hearing, Judge Boulware advised Walmart that he would have to be talked out of giving a spoliation instruction at that point because it was hard to imagine that Walmart did not know about the incident, yet it took no steps to preserve the video.  Judge Boulware made several rulings at the hearing, but he recused the next day and vacated his oral rulings. ECF No. 102.  The same day that Judge Boulware recused, Beckstead moved to withdraw as Walmart's counsel and another lawyer from his firm appeared on Walmart's behalf. ECF Nos. 104; 105.

The case was reassigned to me. ECF No. 103.  On February 14, 2023, I adopted Judge Boulware's oral rulings. ECF No. 108.  I specifically ordered Walmart to "prepare and send a letter to the plaintiffs identifying each employee who was working at the Walmart store at the time of the accident, their job title and duties, and contact information" by February 21, 2023. *Id.* at 2.  Walmart did not comply with my order. Evid. Hrg. Day 2.

After my order, the plaintiffs deposed another Walmart Rule 30(b)(6) witness, Jeremiah Wood.  Wood indicated that there was a repair order for concrete outside the general merchandise entrance on May 2, 2022, but Walmart did not produce a repair report for this work, nor did it produce any repair reports for 2017. ECF No. 118-2 at 670.  According to Wood,

sometimes a Walmart employee, rather than an outside contractor, might conduct repairs, such as filling in cracks in concrete, and that may explain the lack of a repair report. *Id.* at 672-73.

Discovery closed on March 8, 2023. ECF No. 87; Evid. Hrg. Day 2.  On March 15, 2023, Judge Albregts held a hearing on various pending motions related to discovery, including the plaintiffs' motion for an order to show cause. ECF Nos. 112; 133.  During that hearing, Judge Albregts noted that he had ordered Walmart to produce the employee contact information so the plaintiffs could investigate given that Walmart had not preserved the video or any documentation. ECF No. 133 at 23-25.  Judge Albregts once again ordered Walmart to identify every employee on the clock with job title, department, and contact information by March 31, 2023, and he sanctioned Walmart for the plaintiffs having to bring the contempt motion.[8] *Id.* at 39, 41.  Walmart finally complied with that order on March 31, 2023. Evid. Hrg. Day 2.  However, many of the employees were listed as being in the care of Walmart's attorneys, with no other contact information. Evid. Hrg. Day 2, Ex. 20.

Within days of receiving the contact information, the plaintiffs were able to locate several non-salaried former employees who recalled hearing something about the incident. Evid. Hrg. Day 2; *see also* ECF No. 118-2 at 116, 118, 120.  At the evidentiary hearing, the parties stipulated that if called, these witnesses would testify that they heard of an incident where a customer fell, had a seizure, and an ambulance arrived, but that none of them had personal knowledge from witnessing the incident. Evid. Hrg. Day 2.  The plaintiffs also located an employee, Christine Eide, who signed a declaration under penalty of perjury stating that she was the one who retrieved towels for the blood. ECF No. 118-2 at 114.  Eide also stated that Roberts

---

[8] The parties have since resolved the amount of fees Walmart was ordered to pay for this sanction. Evid. Hrg. Day 2.

1   stayed with Buchna while waiting for the ambulance. *Id.*  However, neither side was able to

2   successfully subpoena Eide to testify at the evidentiary hearing and the parties did not stipulate

3   to her declaration being considered for any purpose. *See* ECF Nos. 152; 154; Evid. Hrg. Day 2.

4   The plaintiffs have not overcome Walmart's hearsay objection to this exhibit, so I consider it

5   only as it bears on the possibility that the plaintiffs were able to locate another potential witness

6   who claimed to remember the incident, but not for the truth of the other facts Eide recites in her

7   declaration.

8         On April 7, 2023, the plaintiffs filed the pending motion to strike Walmart's answer. ECF

9   No. 118.  Walmart opposed and attached the declaration of its former counsel, Kuhls, in support

10  of its response. ECF No. 122-1.  Kuhls stated that he met with an unidentified personnel

11  manager, and they interviewed all Walmart employees who were clocked in or working on the

12  day of the incident and who were still employed by Walmart at the time it was responding to

13  discovery, but no employee recalled the incident. *Id.*  He stated they did not contact former

14  employees. *Id.*  Walmart also attached a new declaration from Roberts. ECF No. 122-2.  Roberts

15  stated that she did not recall the incident, but if it was as described she would remember it and

16  would have reported it. *Id.*  Walmart also attached a new declaration from Wood stating that

17  there is no repair report correlated to the May 2, 2022 work order and that repair reports are

18  created only when an outside contractor, rather than a Walmart technician, makes the repair.

19  ECF No. 122-8.[9]

20

21  [9] At the evidentiary hearing, Wood testified that he did not compile the information for the list of
    repair reports that Walmart provided in discovery. Evid. Hrg. Day 1 & Ex. 52 at 5.  Wood thus

22  does not know how the person who compiled that list knew about a May 2022 repair to the
    concrete where no document regarding that repair has ever been produced. Evid. Hrg. Day 1.  He

23  also testified that a repair such as filling in cracks in the concrete likely would not have been
    done by store personnel, so a request for the repair likely would have been opened in Fix It or the
    service channel. Evid. Hrg. Day 1.

In June 2023, Walmart changed counsel again and the Resnick & Louis firm withdrew. ECF Nos. 131; 132.  About six months later, I held a hearing to discuss various issues related to the motion to strike, including whether the surveillance video was ESI, and, if so, whether that precluded sanctions under my inherent power for Walmart's alleged spoliation of the video. ECF Nos. 136; 139.  I also discussed with the parties whether I needed an evidentiary hearing, and what sanctions, if any, may be appropriate. ECF Nos. 136; 139.  The parties thereafter filed status reports regarding how to proceed. ECF Nos. 140; 141.  Based on those status reports, I set a briefing schedule regarding the ESI issue, as well as whether the plaintiffs would be allowed to call Kuhls and Beckstead at the evidentiary hearing. ECF No. 142.  The parties briefed those issues, and I ruled that the surveillance video was ESI. ECF No. 150 at 2.  I also ruled that the plaintiffs could call Kuhls as a witness, but they could not call Beckstead. *Id.* at 8.  I held a two-day evidentiary hearing on May 21 and 22, 2024. ECF Nos. 153; 155.

## II. ANALYSIS

A party spoliates evidence "only if [it] had some notice that the documents were potentially relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F. 3d 995, 1001 (9th Cir. 2002) (simplified).  "The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *In re Nat'l Consumer Mortg., LLC*, No. 2:10-cv-00930-PMP-PAL, 2011 WL 1300540, at *8 (D. Nev. Mar. 31, 2011). Thus, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents" or other evidence. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).  However, a "party does not engage in spoliation when, without notice of the

evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business." *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009). The party seeking sanctions bears the burden of establishing spoliation by showing that the spoliating party (1) destroyed evidence and (2) had notice that the evidence was potentially relevant to the litigation before it destroyed the evidence. *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015).

If I find spoliation, sanctions may include dismissal, excluding the spoliated evidence, or giving an adverse inference jury instruction that imposes a rebuttable presumption that the destroyed evidence would have been detrimental to the destroying party. *See, e.g.*, *Transue v. Aesthetech Corp.*, 341 F.3d 911, 920 (9th Cir. 2003); *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380-81 (9th Cir. 1988). Rule 37 likewise permits sanctions, including "striking pleadings in whole or in part," when a party "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A)(iii). For dismissal to be a proper sanction, I must find "willfulness, fault, or bad faith." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quotation omitted); *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169 (9th Cir. 2012). "Before imposing the harsh sanction of dismissal," I must consider: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.* at 958 (simplified). The prejudice inquiry in this context "looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Id.* at 959 (simplified); *see also Halaco Eng'g Co.*, 843 F.2d at 380-82; *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 369 (9th Cir. 1992). I "should choose the least onerous sanction

corresponding to the willfulness of the destructive act and the prejudice suffered by the other party." *Harfouche v. Stars On Tour, Inc.*, No. 2:13-cv-00615-LDG-NJK, 2016 WL 54203, at *3 (D. Nev. Jan. 5, 2016).

### A. The Surveillance Video

I previously ruled that the surveillance video is ESI. ECF No. 150 at 2.  Federal Rule of Civil Procedure 37(e)[10] provides that "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

For dismissal to be a proper sanction under Rule 37(e)(2) for loss of ESI, I need not find prejudice.  Rather, I "need only find that the Rule 37(e) prerequisites are met, the spoliating party

---

[10] The Rule 37 advisory committee notes to the 2015 amendments state that Rule 37(e) "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures.  It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used."  The Federal Rules' advisory committee notes are not binding, but "[a]s the explanatory notes are contemporaneously drafted by the same entity charged with drafting the rules, they are a particularly reliable indicator of legislative intent" and "the construction given by the Committee is of weight." *Republic of Ecuador v. Mackay*, 742 F.3d 860, 865 (9th Cir. 2014).  The Ninth Circuit has indicated in an unpublished decision that Rule 37(e)'s "detailed language . . . foreclose[d] reliance on inherent authority." *Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018).  Consequently,  I evaluate whether to sanction Walmart for destruction of the video only under Rule 37(e), not my inherent power.

acted with the intent required under Rule 37(e)(2), and lesser sanctions are insufficient to address the loss of the ESI." *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 735 (9th Cir. 2024).  A showing of prejudice is not required "because the finding of intent required by Rule 37(e)(2) can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *Id.* (simplified).

The plaintiffs have met their burden of showing that Walmart destroyed evidence.  It is undisputed that Walmart did not preserve the store's surveillance video and instead allowed the video to record over itself after 30 to 45 days following Buchna's fall.  Walmart's own witnesses testified that a camera positioned near the store entrance likely would have captured the fall and that the camera was working that day.  Moreover, Walmart did not preserve other video evidence from inside the store that would have shown Buchna moving about the store and may have revealed whether he was walking normally before he fell.

The plaintiffs have also met their burden of showing that Walmart reasonably should have known that it needed to preserve the video in anticipation of litigation.  Walmart was on notice that a lawsuit may be forthcoming based on the extent of Buchna's injuries, Beam and Zeiter twice asking for the video, and Beam questioning Walmart employees and a manager three times about what happened to her father.  Although Walmart argued at the evidentiary hearing that perhaps the employees thought it was purely a medical episode and thus did not anticipate litigation, not a single Walmart employee testified consistent with that theory.  Rather, they testified they did not remember the incident, but if Buchna's injuries were as described, it was mandatory for them to preserve the video regardless of fault.

1    The plaintiffs have been prejudiced.  There is no substitute for the video because no one

2    witnessed Buchna fall, Buchna was unable to explain why he fell, and the parties dispute why he

3    fell.  Walmart has taken the position that Buchna had a seizure.  Buchna's medical experts

4    dispute that and testified that if they had a video of the incident, they would be better able to tell

5    what caused him to fall. *See* ECF Nos. 118-2 at 699-700, 731, 767.  Additionally, the video may

6    have shown the condition of the area where Buchna was walking, including whether there were

7    cracks or holes in the concrete or a slippery substance on the ground.  Consequently, Walmart is

8    subject to sanctions under Rule 37(e)(1) for its destruction of the video.

9    The harsher sanctions under Rule 37(e)(2) are also appropriate in this case because I find

10   that Walmart acted with the intent to deprive the plaintiffs of the video's use in litigation.

11   Walmart's litigation position in this case from the outset has been that it did not preserve the

12   video because it had no notice of the incident.  However, Walmart's own witnesses testified that

13   it is implausible that Walmart would not know about a customer who had fallen outside the store,

14   bled from a head wound, and was taken away by an ambulance that was parked outside the

15   store's entrance for over 15 minutes.  I (along with Judges Boulware and Albregts)[11] agree that is

16   not believable that these events could take place without a manager or an asset protection

17   employee being aware of it.  Despite all employees testifying consistently on this point, no

18   explanation has ever been offered as to why the video was not preserved.  Roberts and Devis do

19   not dispute Vann's testimony that they responded to the scene, and Roberts' presence is

20   corroborated by the phone call Roberts had with Beam two days later during which Roberts told

21

22

23   [11] At the October 7, 2022 hearing, Judge Albregts stated that it was "amazing to me that there's not one person in Walmart that has any idea that this happened." ECF No. 88 at 57.  Judge Boulware expressed similar incredulity at the February 7, 2023 hearing.

Beam that she held Buchna's hand until the ambulance arrived.[12]  Roberts and Devis testified that they cannot remember the incident, even though this apparently was one of the only incidents in their careers where they would have observed an injured party bleeding at the store. Even if I could accept that one employee with the responsibility to document the incident inadvertently failed to do so despite the atypical nature of the event, I find it implausible that both would neglect a requirement everyone described as mandatory.  And even if the employees were distracted that day, Beam and Zeiter went to the store and specifically asked about any video.  Beam spoke to another employee the next day and again asked for the video.  And Beam had an emotionally charged conversation with Roberts the day after that.  Yet no one at Walmart preserved the video, took pictures, obtained witness statements, or prepared an incident report. There is no reasonable explanation for this other than an intent to deprive the plaintiffs of the video for litigation purposes.  Walmart thus is subject to sanctions under Rule 37(e)(2) as well.

**B. Discovery Misconduct**

In addition to failing to preserve the video or any other contemporaneous evidence of Buchna's fall, Walmart has engaged in a pattern of willfully obstructive discovery misconduct in this case.  For this type of behavior, I may sanction Walmart under both Rule 37 and my inherent power.

On October 7, 2022, Judge Albregts ordered Walmart to turn over a list of all employees working at the time of the incident, their punch in and out times, and contact information for any employee no longer working for Walmart.  He also ordered Walmart to produce the receipt of

---

[12] I find this phone conversation took place between Beam and Roberts because no other explanation was provided for how Beam knew that Roberts' father had died months before. Beam testified credibly about the call.  Roberts did not deny she had the conversation, she testified only that she could not remember it.

Buchna's purchases and the repair orders.  Walmart was ordered to produce everything within 30 days, but it did not.  If Walmart thought Judge Albregts' orders were erroneous, the proper response would have been to file a motion for reconsideration or an objection, not to disobey the orders.

Walmart's own witnesses testified that obtaining Buchna's receipt and the employees' information would be easy.  Indeed, Kuhls testified he had a list of employees with their punch in and out times before his representation of Walmart ceased in March 2022.  In April 2022, Rivera testified that not only would obtaining this information be easy, but also that he had viewed such a list provided by Walmart's lawyer.  Yet Walmart still had not produced that information to the plaintiffs by the time of the October 2022 hearing nor 30 days after Judge Albregts' order to disclose it.[13]  As of the May 2024 evidentiary hearing before me, Walmart still had not disclosed the source of the information that supported its list of repairs that included repairs for which no repair report has been produced.

By the time Judge Boulware recused, Walmart still had not complied with Judge Albregts' order regarding the employee information, so I ordered Walmart to "prepare and send a letter to the plaintiffs identifying each employee who was working at the Walmart store at the time of the accident, their job title and duties, and contact information" by February 21, 2023.  ECF No. 108 at 2.  Walmart did not comply with this order either.  Its failure to do so is all the more disturbing because Judge Boulware had just expressed to Walmart that he was already leaning toward giving an adverse inference instruction against Walmart.  Walmart's failure to comply with orders from two different judges to turn over information that its own witnesses

---

[13] Walmart's counsel contended that the spreadsheet of employee information was attorney work product.  Even so, there is no explanation for why Walmart did not provide it to the plaintiffs when under court order to do so.

testified is easily obtainable was an intentional attempt to obstruct the plaintiffs from identifying and locating witnesses and other evidence to support their claims.  If Walmart was convinced that none of its employees knew anything about the incident, it is unclear why it would disobey multiple court orders and refuse to provide basic information so the plaintiffs could investigate for themselves.  Once the plaintiffs obtained that information, they quickly located several employees who still remembered hearing about the incident more than four years after it happened.  Walmart is thus subject to sanctions under Rule 37 and my inherent power for disobeying court orders and engaging in obstructive discovery misconduct.

**C. Sanctions**

Walmart is subject to sanctions both for destroying the video and for its willful disobedience of court orders.  The plaintiffs request that I strike Walmart's answer entirely. Walmart argues for no or lesser sanctions.

I must consider several factors before striking Walmart's answer or entering default.  All but one of these factors weigh in favor of a harsh sanction.  Walmart's destruction of the video and discovery misconduct were willful, not inadvertent.  Walmart's conduct has impacted the public's interest in expeditious litigation by dragging out discovery and obstructing the plaintiffs' ability to identify witnesses with a memory of this incident until after discovery closed. Walmart's conduct also interfered with this court's management of its docket because that conduct has resulted in multiple motions, hearings, orders, and sanctions to get Walmart to turn over basic information.  The plaintiffs are significantly prejudiced by the video's destruction because no one witnessed the fall, and the failure to produce the video, pictures, and repair reports leaves questions about the concrete's condition during the relevant time.  As to the employee witnesses, however, the prejudice to the plaintiffs' case on the merits is less impactful.

It is unclear what more information any of them would have provided if contacted sooner because none witnessed the fall.[14]  The public policy favoring disposition of cases on their merits weighs against dismissal or striking of defenses, but it always does.  Given Walmart's efforts to stymie the plaintiffs' ability to have this case decided on the merits, this factor weighs only slightly in Walmart's favor.

I thus consider the availability of lesser sanctions.  Striking Walmart's answer entirely is more severe than necessary to cure the prejudice because Walmart may have defenses that are not impacted by its own misconduct, such as challenges to damages.  But an adverse instruction or rebuttable presumption does not go far enough to address Walmart's actions and the resulting prejudice because Walmart willfully destroyed the best evidence of what caused Buchna's fall and then engaged in a pattern of lengthy, obstructive discovery misconduct.  On this point, I note that even after Judge Boulware signaled that Walmart would have to talk him out of giving an adverse inference instruction, Walmart did not comply with my February 14, 2023 order.  Walmart thus was not deterred by the possibility of an adverse inference instruction.  Accordingly, no lesser sanction is available to address the prejudice than to strike Walmart's defenses related to liability.

I thus preclude Walmart from disputing that a hazardous condition on its property caused Buchna to fall and be injured, that Walmart had notice of the hazard and failed to remedy it, and that Buchna was not comparatively negligent.  However, I do not strike Walmart's answer entirely because striking all defenses, including those unrelated to Walmart's misconduct, is too severe here.  The sanction I am imposing is an available lesser sanction that cures the prejudice.

---

[14] It is unknown whether Eide (who signed a declaration stating that she brought the towels at Roberts' direction but who appears to have evaded service to testify at the evidentiary hearing) would have been more cooperative if contacted sooner.

Thus, to the extent Walmart has defenses that are unrelated to its misconduct, such as the reasonableness of Buchna's medical expenses, whether specific medical expenses were causally connected to the fall, whether his expected lifespan was shortened through pre-existing medical conditions, or a failure to mitigate, those defenses are not stricken.

**III.  CONCLUSION**

I THEREFORE ORDER that the plaintiffs' motion to strike **(ECF No. 118) is GRANTED in part**.  The defendants are precluded from disputing that a hazardous condition on the property caused Buchna to fall and injure himself, that the defendants had notice of the hazard and failed to remedy it, and that Buchna was not comparatively negligent.

I FURTHER ORDER that by July 1, 2024, the parties shall confer regarding whether they intend to file a motion for summary judgment on any issue remaining for trial.  If any party intends to file a summary judgment motion, then it is due by July 19, 2024.  If no party intends to file a motion, then the proposed joint pretrial order is due by July 19, 2024.

DATED this 17th day of June, 2024.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

28